IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SCOTTSDALE INSURANCE
COMPANY,

      Plaintiff

      v.

DICK MACKEY GENERAL
CONTRACTING, INC.
and
VIGILANT INSURANCE
COMPANY

      Defendants

:
:
:
:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION NO.  3:04-1363**

(JUDGE NEALON)

**FILED
SCRANTON**

NOV 2 3 2005

PER _____
             DEPUTY CLERK

## MEMORANDUM AND ORDER

On June 24, 2004, Scottsdale Insurance Company ("Scottsdale") filed a

complaint for declaratory judgment against Dick Mackey General Contracting, Inc.

("Mackey") and Vigilant Insurance Company ("Vigilant").  (Doc. 1).  The complaint

seeks a declaration that Scottsdale does not owe a duty to defend or indemnify under

its policy with  Mackey for the claims asserted against Mackey by Vigilant in the

Lackawanna County Court of Common Pleas.  The underlying Lackawanna County

complaint alleges that Mackey was hired by Peter Amato ("Amato"), the insured of

Vigilant, to winterize an outdoor pool at the Amato residence.  Mackey installed pool

fans and heaters which ultimately failed and caused the pool water to freeze.  Mackey

was called back to the site to remove the fans and the resulting ice.  During this

process, granite slabs which were part of the pool were damaged.[1]  Vigilant claims

that it paid Amato $143, 000.00 for the damage to the granite slabs.  Count I of the

underlying complaint alleges that the damage resulted from Mackey's negligent acts

and omissions while Count II asserts a breach of contract claim.

On July 26, 2004 Mackey filed an Answer and Counterclaim (Doc. 4) to

Scottsdale's federal Complaint and on August 9, 2004, Vigilant submitted its Answer

to the Complaint.  (Doc. 6).  Scottsdale moved  for judgment on the pleadings on

April 28, 2005 (Doc. 19) .  On May 17, 2005, Vigilant responded to Scottsdale's

motion.[2]  (Doc. 32).  On May 17, 2005, Mackey also filed its Brief in Opposition to

Scottsdale's Motion (Doc. 33) as well as its own Motion for Judgment on the

Pleadings.  (Doc. 34).  Scottsdale subsequently filed a Reply to Vigilant's Brief in

Opposition (Doc. 35) and a Brief in Opposition to Mackey's Motion on June 1, 2005

(Doc. 36).  Pursuant to Order of this court (Doc. 37) the parties have filed

supplemental briefs on the issue of coverage.  (Docs. 43, 44, 45, 47).

---

[1]Mackey denies removing the pumps or causing any damage to the granite slabs.

[2] The docket entries reflecting the entry of Vigilant's Reply Brief and Brief in Support thereof, at
Documents 31 and 32, actually reference Vigilant's Brief in Opposition to Scottsdale's Motion for
Judgment on the Pleadings.

2

As previously noted, Scottsdale contends that it has no duty to indemnify or defend Mackey for claims brought against Mackey by Vigilant in the Lackawanna County Court of Common Pleas. Scottsdale argues that the policy under which it insured Mackey excluded: (1) coverage for contractual liability; (2) coverage for property damages occurring while Mackey was "performing operations" on the property; and (3) coverage for damage caused by the incorrect installation of materials. In its supplemental brief, Scottsdale alleges that the Policy, with its exclusions, applied only to property damage to property other than the pool and that the Errors and Omissions clause provided additional coverage for damage which did not occur during the policy period but resulted later from actions taken during the period.

In Response to Scottsdale's Motion, Vigilant asserts that the exclusions upon which Scottsdale relies did not apply or were rendered inapplicable by the Endorsement language set forth at the end of the policy.

In its Motion for Judgment on the Pleadings, Mackey argues that Scottsdale has a duty to defend since: (1) the negligence claim is covered by the Policy, even if the contract claim is not covered; and (2) any ambiguities in the Policy provisions must be construed against the insurance company. Mackey further avers that the provisions under which Scottsdale claims exclusion are not applicable since those

3

provisions apply only to damage done while work is in progress as opposed to damage occurring after the project has been completed and the contractor has left the job. Finally, Mackey relies on additional coverage provided under the policy's Errors and Omissions Endorsement as obligating Scottsdale to defend and indemnify.

Both Scottsdale's and Mackey's Motions for Judgment on the Pleadings will be decided herein since the underlying facts and the applicable legal analysis are identical.

## I.      LEGAL STANDARD

Under Rule 12( c ) of the Federal Rules of Civil Procedure, after the pleadings are closed, any party may move for judgment on the pleadings. A Rule 12( c ) motion is designed to provide a means for disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court will take judicial notice. *See* Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure, § 1367. A court should only grant a motion for judgment on the pleadings if it is clear that the merits of the controversy can be fully and fairly decided in this summary manner. See id. at § 1369.

In deciding a motion for judgment on the pleadings, a court must consider the facts alleged in the pleadings and the inferences drawn from these facts in the light most favorable to the nonmoving party. *See* Oxford Assocs. v. Waste Sys. Auth. of E.

4

Montgomery County, 271 F.3d 140, 144-45 (3d Cir. 2001); McCoy v. Southeastern Pa. Transp. Auth., No. 01-5881, 2002 WL 376913 at *1 (E.D. Pa. 2002). The motion may only be granted if there are no factual allegations in the pleadings which, if proven, would allow the nonmoving party to recover. *See* Oxford Assocs., 271 F.3d at 144-45; McCoy, 2002 WL 376913 at *1.

## II.    STATEMENT OF FACTS

The facts which are relevant to the instant motions are undisputed among the parties.

At some point during the period between November, 2001 and January, 2002, Amato hired Mackey to winterize an outdoor pool located at Amato's residence. (Doc. 19, ¶ 9, Doc. 33, p.1).  Specifically, Amato requested that Mackey place pumps, fan and heaters inside the pool to prevent the water therein from freezing.  (Doc. 33, p. 2).  The pumps, fans and heaters which Mackey installed failed, which caused the pool water to freeze.  (Doc. 19, ¶ 10).  As a result the pumps, fans and heaters had to be removed and allegedly, during this removal process, Mackey caused damage to the granite slabs which made up the pool wall.  (Doc. 19, ¶11, Doc. 33, p.2).

Amato is insured by Vigilant which has paid Amato $143, 000.00 for the

5

damage to the pool.[3]  Mackey is insured by Scottsdale, which argues that it need not

defend Mackey against the claims brought by Vigilant since these claims are

excluded from coverage under the terms of the insurance policy that Scottsdale issued

to Mackey.

The Scottsdale Insurance Policy ("Policy") is a Commercial General Liability

policy.  (Doc. 27-1, p. 32).  The Policy provides that Scottsdale will defend its insured

against claims arising from "bodily injury"[4] or "property damage"[5] to which the

Policy applies.  Further, Scottsdale will also provide indemnification for damages

because of "bodily injury" or "property damage" for which the Policy provides

coverage.  (Doc. 27-1, p. 44, § I, ¶ 1(a)).  The Policy applies to "bodily injury" and

"property damage" only if:

---

[3] It appears that the parties agree that the sum of $143, 000.00 represents the monetary value for damage solely to the granite slabs.  There is no allegation in the Lackawanna County Court Complaint that any other part of the pool was damaged or that payment was made for damage to any other part of the pool, specifically for the fans, pumps and heaters.  In the Lackawanna County Court Complaint, Vigilant only seeks an award of $143, 000.00 and this Court renders the within opinion based on the assumption that the $143, 000.00 payment was made only for damage to the granite slabs.

[4] "'Bodily Injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  (Doc. 27-1, p.53, § V, ¶ 3).

[5] "'Property damage' means:
        a. Physical injury to tangible property, including all resulting loss of use of the property .
All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
        b. Loss of use of tangible property that is not physically injured.  All such loss of use shall
be deemed to occur at the time of the 'occurrence' that caused it."  (Doc. 27-1, p.58, § V, ¶ 17).

(1) the "bodily injury" or "property damage" is caused by an "occurrence"[6] that takes place in the "coverage territory;"[7] and

(2) the "bodily injury" or "property damage" occurs during the policy period.

(Doc. 27-1, p. 44, §I, ¶ 1(b)(1), (2)).

The Policy excludes coverage for contractual liability under Section I, paragraph 2(b) which provides:

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
(1) That the insured would have in the absence of the contract agreement; or
(2) Assumed in a contract or agreement that is an "insured contract"[8], provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement ....

(Doc. 27-1, p. 44, § I, ¶ 2(b)).

"Damage To Property" excludes from coverage under Section I, paragraph 2(j) the following "property damage:"

"Property damage" to:
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those

---

[6] "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 27-1, p.55, § V, ¶ 13).

[7] In relevant part of the definition, "coverage territory" means the United States of America. (Doc. 27-1., p.53, § V, ¶ 4).

[8] There is no allegation that an "insured contract" was in place in this situation. Further, the definition of "insured contract" is not applicable to any alleged contractual obligation involved in this case.

operations; or

(6) That particular part of any property that must be restored, repaired, or replaced because "your work"[9] was incorrectly performed on it.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."[10] (Doc. 27-1, p.47, §1, ¶ 2(j)(5), (6)).

---

[9]"Your work" means:
(a) Work or operations performed by you or on your behalf; and
(b) Materials, parts or equipment furnished in connection with such work or operations.

'Your work' includes:
(a) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work'; and
(b) The providing of or failure to provide warnings or instructions."
(Doc. 27-1, p. 56, § V, ¶ 21).

[10] "'Products-completed operations hazard':
(a) Includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except:
(1) Products that are still in your physical possession; or
(2) Work that has not yet been completed or abandoned. However, 'your work' will be deemed completed at the earliest of the following times:
(a) When all of the work called for in your contract has been completed.
(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
( c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(b) Does not include 'bodily injury' or 'property damage' arising out of:
(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the 'loading or unloading' of that vehicle by any insured;
(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or
(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

Finally, the Policy includes an Endorsement entitled "Errors and Omissions Extension" which modifies the insurance provided under the "Commercial General Liability Coverage Part" and provides, as follows:

> Description of operations: SWIMMING POOL CONTRACTOR
>
> In Consideration of an additional premium, and subject to the conditions and exclusions in the coverage form, the coverage afforded by this endorsement shall apply to sums which you shall become legally obligated to pay as a result of 'bodily injury' or 'property damage' due to any negligent act, error or omission committed during the policy period in the conduct of the operations shown above, whether committed by you or by an person for whom you are legally responsible.
>
> Additional Premium: $ <u>INCL</u>

(Doc. 27-1, p. 62).

## III.  Scottsdale's Motion for Judgment on the Pleadings

Scottsdale argues that it need not defend or indemnify Mackey since: (1) exclusions j(5) and j(6) of the Policy are applicable;  (2) the Endorsement is similarly subject to the same j(5) and j(6) Policy exclusions; and (3) the Policy excludes coverage for contract claims.

### (A) EXCLUSION UNDER j(5)

Scottsdale does not have a duty to provide either a defense or indemnification since the damage incurred falls within the j(5) exclusion to coverage.  Section I (2) (j)

(5) excludes coverage for property damage to:

> That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations.

(Doc. 27-1, p. 47, § 1, ¶ 2(j)(5)).

### *(1) Particular Part of Real Property*

Neither party disputes that the pool itself is real property under the applicable case law.  Rather, the dispute regards what portions of the pool comprise the "particular part" of real property that Mackey was working on when the damage occurred.  Scottsdale maintains that the "particular part" of the real property extends to the entirety of the pool structure but not to adjacent or nearby portions of real property such as a deck or a patio.  On the other hand, Mackey contends that the "particular part" language limits the application of the exclusion solely to damage occurring to the fans and heaters, which Mackey was working on at the time the granite was damaged.  According to Mackey,  damage to the granite would be covered under the Policy  since Mackey was not working on that "particular part" of the pool when the damage occurred.

Both parties cite American Equity Ins. Co. v. Van Ginhoven, 788 So. 2d 388 (Ct. App. Fla. 2001) in support of their arguments.   Van Ginhoven involved an action for property damage to a homeowner's swimming pool caused by the negligence of the general contractor.  The contractor was hired to make spot repairs, clean the pool

10

surface and replace up to six (6) pool tiles. Both parties understood that the completion of these tasks would require the pool to be drained. As the contractor drained the pool, the water table pressure caused the pool to pop out of the ground, resulting in damage to the pool, the pump, a heating system, a deck, a screen enclosure and the surrounding landscaping. In applying the j(5) exclusion, the court held that the exclusion applied to all property on which work was incorrectly performed. Consequently, this did not limit the exclusion application solely to the six (6) tiles and spot repairs that the contractor was hired to do. Rather, the exclusion applied to damage to the pool but did not exclude damage to plumbing, electrical, deck work, patio or screen enclosure.

The case law language uniformly limits the j(5) exclusion to damage done to land or other real property upon which the contractor was working. *See* Larson v. United Capital Ins. Co., 845 F. Supp. 451 (W.D. Mich. 1993), Van Ginhoven, 788 So. 2d 388. However, in applying j(5) the Courts have also held that the phrase "particular property" does not limit the exclusion to the precise and isolated spot upon which work was actually being performed. *See* William Crawford, Inc. v. Travelers Ins. Co., 838 F. Supp. 157 (S.D.N.Y. 1993) (applying j(5) to exclude coverage for damage to 700 square foot apartment when fan drying living room and library plaster ignited in the foyer and caused damage throughout apartment.); Vinsant Electrical Contractors v. Aetna Casualty & Surety Co., 530 S.W.2d 76 (Tenn. 1975) (j(5)

excluded coverage for damage caused to entire switchboard while contractor was working on an isolated spot of the switchboard); <u>Larson v. United Capital Insurance Co.</u>, 845 F.Supp 451 (W.D. Mich. 1993) (j(5) applied to property damage underneath the system that was being installed and to any property which was dug into, drilled, moved or disturbed in the construction of the system but did not exclude coverage for damage to land opposite the area where the system was installed).   In accord with these holdings it is concluded that the j(5) exclusion cannot be interpreted as applying only to damage to the fans and pumps.   Rather, the "particular part" language applies to the pool in its entirety.   Therefore, the granite slabs are properly considered to be included within the "particular part" of real property on which Mackey was working.

*(2) Work Completed*

Exclusion j(5) only applies while "performing operations" and not to damage after the completion of work. *See* Cunningham & Fischer, *Insurance Coverage in Construction - the Unanswered Question*, 33 Tort & Ins. L.J. 1063 (1998).   Therefore it must be determined whether Mackey's work on the pool was ongoing or completed at the time the damage occurred.

Mackey cites numerous cases in support of its argument that j(5) is inapplicable since Mackey's winterizing of the pool was completed at the time of the damage. While the cases on which Mackey relies require that work is in progress, as opposed to being completed or abandoned in order for j(5) to apply, they are also

12

distinguishable from the instant case.  The damage in each of the Mackey cited cases revealed itself after the job was complete and in no instance did the contractor return to fix the damage.  In the present matter, Mackey returned to the pool and was actively working on the pool when the damage occurred.

For example, <u>American States Ins. Co. v. Powers</u>, 262 F. Supp.2d 1245 (D. Kan. 2003), involved damage to a building which occurred one year after completion of construction of the building.  There is no indication, however, that the contractor returned to the construction site to remedy the problem and in so doing caused further damage.  Similarly, <u>Fisher v. American Family Mutual Ins. Co.</u>, 579 N.W. 2d 599 (N.D. 1998), involved damage which occurred several months after a contractor completed the installation of hardwood flooring.  The court explained that j(5) excludes coverage only during the time the contractor was working on the property.  Again, the facts of <u>Fisher</u> differ from the instant case in that the contractor did not return to the site, as Mackey did, and cause damage while correcting a problem.  Another case upon which Mackey relies held that j(5) did not apply to damage caused when a contractor was cleaning his lacquering equipment upon completion of his contractual obligations to paint and lacquer the interior of a house.  <u>Columbia Mutual Ins. Co. v. Schauf</u>, 967 S.W.2d 74 (Mo. 1998).  The <u>Schauf</u> facts are also distinguishable from the instant case in that the contractor was cleaning his own equipment at the time the damage occurred, he was no longer doing the work for

13

which he was hired.

The j(5) exclusion is "intended to 'bar coverage for the work being done by a contractor when claims arise at the time the work is being performed.'" <u>American States Ins. Co. v. Powers</u>, 262 F. Supp. 2d 1245, 1250 (D. Kan. 2003).  While Mackey makes the argument that his original work on the pool was complete when the damage occurred, he fails to acknowledge that by returning to the pool and removing the fans, he recommenced working.   It is without question that the damage occurred while Mackey was working on the pool.   Thus j(5) excludes coverage for damage to the pool's granite slabs.

### (B) EXCLUSION UNDER j(6)

Additionally, Scottsdale does not have a duty to provide either a defense or indemnification since the damage incurred falls within the j(6) exclusion to coverage. Section I (2) (j) (6) excludes coverage for property damage to:

> That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Doc. 27-1, p.47, § 1, ¶ 2(j)(6)).

Paragraph j(6) does not apply to "property damage" included in the "products completed operations hazard."

The "particular part" analysis under j(6) is identical to the j(5) analysis and therefore, for the previously stated reasons,  the "particular part" includes the pool in

14

its entirety.

The argument regarding the application of j(6) again centers around the determination of what constitutes completed work. While both j(5) and j(6) only apply to continuing work, j(6) is further limited by the "products completed operation hazard" which includes "all property damage arising out of 'your product' or 'your work' except products still in your physical possession or work not yet completed...." By these terms, exclusion j(6) does not apply to damage which occurs after work has been completed.

Exclusion j(6) "excludes coverage for damages arising out of the work the insured contracted to perform that must be restored, repaired or replaced." 33 Tort & Ins. L.J. 1063, 1094. According to the state court complaint, the damage to the granite slabs occurred when Mackey was removing either the fans that were malfunctioning due to improper installation or the ice that resulted from the flawed fans. Consequently, it is evident that the damage was alleged to have occurred while Mackey was working to remove, repair or replace the fans. Since the alleged damage occurred while Mackey was working to replace or remove the fans, the j(6) exclusion applies.

### ( C ) ENDORSEMENT LANGUAGE

The Policy contains an Endorsement titled "Errors and Omissions Extension" which provides as follows:

15

Description of operations: SWIMMING POOL CONTRACTOR

In Consideration of an additional premium, and subject to the conditions and exclusions in the coverage form, the coverage afforded by this endorsement shall apply to sums which you shall become legally obligated to pay as a result of 'bodily injury' or 'property damage' due to any negligent act, error or omission committed during the policy period in the conduct of the operations shown above, whether committed by you or by an person for whom you are legally responsible.

Additional Premium: $ <u>INCL</u>

(Doc. 27-1, p. 62).

The endorsement provides coverage for "'property damage' due to any negligent act ... committed during the policy period." This extends the original Policy coverage, which provides only for property damage occurring during the policy period, to damages developing after the policy period caused by negligence during the policy period. The endorsement language makes it apparent that this coverage extension is likewise subject to the exclusions set forth in the Policy. As hereinbefore stated, j(5) and j(6) exclude coverage for the claims made in the Lackawanna County action. Since j(5) and j(6) are not affected by the endorsement language, the endorsement does not offer any coverage for the damage.

## *(D) CONTRACT COVERAGE*

The Policy excludes coverage for Contractual Liability under Section I (2) (b) which provides:

(2) This insurance does not apply to:

16

     (b) Contractual Liability

        "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement...."

(Doc. 27-1, 9.44, §1, ¶ 2(b)).

In its Brief in Opposition, Mackey does not argue that coverage is not excluded under the Contract Exclusion itself but rather that Scottsdale is obligated to defend the contract claim since the negligence claim is covered under the policy. Mackey relies on the holding in <u>Frog, Switch & Manufacturing Co. v. Travelers Ins. Co.</u>, 193 F.3d 742, 746 (3d Cir. 1999), which requires the insurer to defend all claims if a single claim in a multiclaim lawsuit is potentially covered.

While Mackey's citation expresses sound legal precedent, it is inapplicable to the instant case since, as previously explained, there is no claim potentially covered by the Policy. Exclusions j(5) and j(6) exclude coverage on the underlying negligence action. Since Mackey has not offered any persuasive reason why the Contract Exclusion should not apply, Scottsdale is not obligated to provide any coverage based on the contract claims.

## IV.   Mackey's Motion for Judgment on the Pleadings

For the reasons above, judgment on the pleadings is appropriately entered in favor of Scottsdale. Therefore, Mackey's motion for judgment on the pleadings must be denied.

17